HAHN & HESSEN LLP
488 Madison Avenue
New York, New York 10022
(212) 478-7200
Mark T. Power (MP-1607)
John P. Amato (JP-4997)
Robert J. Malatak (RM-6292)
Edward L. Schnitzer (ES-6299)

*Counsel to The Official Committee of Unsecured
Creditors of Musicland Holding, Corp., et al.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

In re                                                                              Case No. 06-10064 (SMB)

MUSICLAND HOLDING CORP., *et al*.,[1]
                                                                                   Chapter 11
                                        Debtors.

------------------------------------------------------------------x                Jointly Administered

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF MUSICLAND HOLDING CORP., *et
al*.,

                                        Plaintiff,

                    - against -                                                    Adv. Proc. No. 08-        _____(SMB)

BEST BUY CO., INC., BRADBURY H. ANDERSON,
DAVID P. BERG, CONNIE B. FUHRMAN, KEVIN P.
FREELAND, DARREN R. JACKSON, RODGER R.
KROUSE, MARC J. LEDER, ALLEN U. LENZMEIER
and JAMES L. MUEHLBAUER,

                                        Defendants.

------------------------------------------------------------------x

## ADVERSARY PROCEEDING COMPLAINT

Plaintiff, the Official Committee of Unsecured Creditors ("Plaintiff" or the "Committee")

of the above-captioned debtors and debtors-in-possession, by and through their counsel Hahn &

Hessen LLP, hereby files this adversary proceeding complaint, and, in support thereof, alleges:

---

[1]    The Debtors are: Musicland Holding Corp., Media Play, Inc., MG Financial Services, Inc., MLG Internet, Inc., Musicland Purchasing Corp., Musicland Retail, Inc., Request Media, Inc., Sam Goody Holding Corp., Suncoast Group, Inc., Suncoast Holding Corp., Suncoast Motion Picture Company, Inc., Suncoast Retail, Inc., TMG Caribbean, Inc., TMG-Virgin Islands, Inc. and The Musicland Group, Inc.

## NATURE OF THE PROCEEDING

1.      In or around December 2000, Defendant Best Buy Co., Inc. ("Best Buy")

acquired Musicland (hereinafter defined) in a strategic acquisition to exploit Musicland's mall-

based retail entertainment-related distribution channels which annually reached more than 300

million customers.  As part of the acquisition, Best Buy filed disclosures with the United States

Security and Exchange Commission ("SEC") and made numerous public statements that it had

agreed to assume approximately $271 million in long term debt that The Musicland Group, Inc.

("TMG") had outstanding to various third-parties.  Consistent with these statements, Best Buy

actually assumed the debt in or about December 2000, and it proceeded to make additional

capital investments in Musicland thereafter through the 2001 and 2002 calendar years.

2.      Best Buy's hope to receive a return on its Musicland investment did not

materialize.  Knowing full well that its capital investment was not recoverable, Best Buy and the

other defendants engineered a series of transactions designed to disguise Best Buy's capital

investment as debt in an attempt to recover all (or, at least, a portion) of its investment.  To this

end, Best Buy (practically on the eve of its sale of Musicland) caused TMG to execute several

credit-type documents which characterized Best Buy's capital investment as debt, and, pursuant

to which Musicland transferred more than $145 million to Best Buy -- purportedly in partial

satisfaction of such debt.  These transfers, made while Musicland was insolvent, were fraudulent

and/or constituted illegal dividends, or, in the alternative, unlawful payments to Best Buy.

3.      Musicland's officers and directors knew, should have known, or were otherwise

mistaken to the fact, that Best Buy's contributions to Musicland were in the nature of equity, not

debt or were not recoverable under applicable insider preference laws, and therefore, breached

their fiduciary duties to Musicland by authorizing or otherwise permitting Musicland to make the

upstream transfers at a time when it was insolvent.

4.    This proceeding seeks monetary damages or equitable relief for, among other things, (a) Best Buy's receipt of fraudulent transfers, illegal dividends or unlawful insider payments totaling more than $145 million; and (b) the dereliction in duties on behalf of Musicland's officers and directors who knew, should have known, or were otherwise mistaken to the fact, that the approximately $145 million in transfers to Best Buy were improper.

## JURISDICTION AND VENUE

5.    This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

6.    This adversary proceeding has been referred to this court pursuant to 28 U.S.C. § 157(a).

7.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).

8.    Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a).

# PARTIES

A.    **Plaintiff**

9.      The Debtors Musicland Holding Corp., Media Play, Inc., MG Financial Services, Inc., MLG Internet, Inc., Musicland Purchasing Corp., Musicland Retail, Inc., Request Media, Inc., Sam Goody Holding Corp., Suncoast Group, Inc., Suncoast Holding Corp., Suncoast Motion Picture Company, Inc., Suncoast Retail, Inc., TMG Caribbean, Inc., TMG-Virgin Islands, Inc. and The Musicland Group, Inc (collectively, "Musicland" or the "Debtors"),[2] are (with the exception of Suncoast Holding Corp., which is a Florida corporation) all Delaware corporations that, for all relevant times hereto, maintained executive offices in Minnetonka, Minnesota.

10.     On January 12, 2006 (the "Petition Date"), the Debtors commenced with this court, voluntary cases under Chapter 11 of the Bankruptcy Code.

11.     Since the Petition Date, the Debtors have been managing their affairs and conducting their businesses as debtors-in-possession, pursuant to Bankruptcy Code §§ 1107 and 1108.

12.     On January 20, 2006, the United States Trustee for the Southern District of New York appointed seven of the Debtors' largest unsecured creditors to the Committee.

13.     Pursuant to an order dated February 6, 2007, the court appointed the Committee as a representative of the Debtors' estates for the purpose of, among other things, investigating, pursuing, prosecuting and, if appropriate, compromising and settling any and all claims arising under Chapter 5 of the Bankruptcy Code.[3]

---

[2]    The terms "Musicland" and "Debtors" do not include Musicland Holding Corp. prior to June 16, 2003.

[3]    Simultaneously with the filing of this adversary proceeding complaint the Committee is filing a stipulation for court approval vesting the Committee with authority to prosecute additional claims for the benefit of the Debtors' estates.

### B.     Corporate Defendant

14.     Upon information and belief, defendant Best Buy is a Delaware corporation with an office at 7601 Penn Avenue S., Richfield, Minnesota 55423, maintains a registered agent in Delaware, and owns and operates many large box retail stores in New York.

### C.     Individual Defendants

15.     Upon information and belief, defendant Bradbury H. Anderson ("Anderson") is an individual residing at 2250 W. Lake of The Isles Pkwy, Minneapolis, MN 55405-2426.  At times relevant to the claims set forth herein, Anderson was a Director of TMG, Musicland Store Corporation ("MSC"), Media Play, Inc., MG Financial Services, Inc., MLG Internet, Inc., Musicland Retail, Inc., Request Media, Inc., Suncoast Group, Inc., Suncoast Motion Picture Company, Suncoast Retail, Inc., TMG Caribbean, Inc. and TMG-Virgin Islands, Inc.; Chief Executive Officer of MSC; and Vice Chairman, Chief Executive Officer and Director of Best Buy.

16.     Upon information and belief, defendant David P. Berg ("Berg") is an individual residing at 703 Hidden Creek Trail, Saint Paul, MN 55118-3752.  At times relevant to the claims set forth herein, Berg was Vice President, Secretary and General Counsel, of TMG, MSC, Media Play, Inc., MG Financial Services, Inc., MLG Internet, Inc., Musicland Retail, Inc., Request Media, Inc., Suncoast Group, Inc., Suncoast Motion Picture Company, Suncoast Retail, Inc., TMG Caribbean, Inc. and TMG-Virgin Islands, Inc.

17.     Upon information and belief, defendant Connie B. Fuhrman ("Fuhrman") is an individual residing at 9117 N. Highway 1247, Eubank, KY 42567-8638.  At times relevant to the claims set forth herein, Fuhrman was a Director and President of TMG, MSC, Media Play, Inc.,

MG Financial Services, Inc., MLG Internet, Inc., Musicland Retail, Inc., Request Media, Inc., Suncoast Group, Inc., Suncoast Motion Picture Company, Suncoast Retail, Inc., TMG Caribbean, Inc. and TMG-Virgin Islands, Inc.; and President of MSC.

18.    Upon information and belief, defendant Kevin P. Freeland ("Freeland") is an individual residing at 10509 Bluff Road, Eden Prairie, MN 55347-5011.  At times relevant to the claims set forth herein, Freeland was President of TMG and MSC; and Senior Vice President of Best Buy.

19.    Upon information and belief, defendant Darren R. Jackson ("Jackson") is an individual residing at 290 Woodlawn Avenue, Saint Paul, MN 55105-1237.  At times relevant to the claims set forth herein, Jackson was Senior Vice President of Finance and Treasurer/Executive Vice President – Finance and Chief Financial Officer and Director of MSC; Director of TMG, Media Play, Inc., MG Financial Services, Inc., MLG Internet, Inc., Musicland Retail, Inc., Request Media, Inc., Suncoast Group, Inc., Suncoast Motion Picture Company, Suncoast Retail, Inc., TMG Caribbean, Inc. and TMG-Virgin Islands, Inc; and Senior Vice President Finance, Treasurer and Chief Executive Officer of Best Buy.

20.    Upon information and belief, defendant Rodger R. Krouse ("Krouse") is an individual residing at 3673 Carlton Place, Boca Raton, Florida 33496-4006.  At times relevant to the claims set forth herein, Krouse was a Director and Vice President of TMG; and Co-Chief Executive Officer of Sun Capital Partners Inc. ("Sun").

21.    Upon information and belief, defendant Marc J. Leder ("Leder") is an individual residing at 18249 Long Lake Drive, Boca Raton, Florida 33496-1930.  At times relevant to the claims set forth herein, Leder was a Director and Vice President of TMG; and Co-Chief Executive Officer of Sun.

22.     Upon information and belief, defendant Allen U. Lenzmeier ("Lenzmeier") is an individual residing at 750 S. 2nd Street, Apt. 802, Minneapolis, MN 55401-2373.  At times relevant to the claims set forth herein, Lenzmeier was Director of TMG, MSC, Media Play, Inc., MG Financial Services, Inc., MLG Internet, Inc., Musicland Retail, Inc., Request Media, Inc., Suncoast Group, Inc., Suncoast Motion Picture Company, Suncoast Retail, Inc., TMG Caribbean, Inc., TMG-Virgin Islands, Inc.; and Vice Chairman, President, Chief Operating Officer and Director of Best Buy.

23.     Upon information and belief, defendant James L. Muehlbauer ("Muehlbauer") is an individual residing at 9008 Loch Lomond Blvd. Minneapolis, MN 55443-3918.  At times relevant to the claims set forth herein, Muehlbauer was Vice President, Chief Financial Officer-General Counsel and Secretary/Treasurer of TMG; and Vice President and Treasurer of MSC, Media Play, Inc., MG Financial Services, Inc., MLG Internet, Inc., Musicland Retail, Inc., Request Media, Inc., Suncoast Group, Inc., Suncoast Motion Picture Company, Suncoast Retail, Inc., TMG Caribbean, Inc. and TMG-Virgin Islands, Inc.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### A.     Best Buy's Strategic Acquisition of Musicland

24.     According to its SEC Form 8-K filing as of March 6, 2003 (Ex. 99, thereto), "Best Buy acquired [Musicland] in January 2001 for $696 million."

25.     Best Buy reported in other SEC filings that it "acquired the common stock of MSC for $425 million, including transaction costs, plus [the assumption of] long-term debt valued at $271 million."

26.     Best Buy publicly announced that "[t]hese strategic moves position Best Buy to grow profits through new customers, new channels of distribution and improved efficiencies."

27.    Upon information and belief, Best Buy wanted to capitalize on Musicland's mall-based retail distribution channels for pre-recorded music, movies and other entertainment-related products, which included more than 1,300 retail stores that annually attracted more than 300 million customers.

28.    Upon information and belief, Best Buy believed that it would be able to receive a return on its $696 million investment upon the success of its Musicland acquisition which, hopefully was expected to translate into a significant increase in revenues and profits for Best Buy's direct benefit.

**B.    Best Buy's Capital Investment in Musicland**

29.    As part of its acquisition of Musicland, Best Buy made a capital infusion of $271 million into Musicland which TMG used to make a tender offer to retire long-term debt that TMG had outstanding with various third parties under Senior Subordinated Notes (the "Third Party Debt").

30.    Best Buy represented to the public that the manner in which it caused the Third Party Debt to be retired represented an assumption of the Third Party Debt by Best Buy.

31.    Upon information and belief, during the period 2001 through March 31, 2003, Best Buy made additional equity investments in Musicland.

32.    On information and belief, as of March 31, 2003, the amount of net equity investments that Best Buy had made in Musicland totaled $381,256,676, in addition to Best Buy's $425 million expenditure to purchase MSC's common stock.

**C.    Best Buy Prepared Musicland For Sale After the Company Suffered Mounting Losses**

33.    In or around early 2003, Best Buy decided to sell Musicland due to the company's continuing and increasing losses.

34.    However, Best Buy was unsuccessful in locating a buyer who would pay a purchase price sufficient to enable Best Buy to receive a return of any part of its equity.

35.    Upon information and belief, having found no viable purchaser, Best Buy started to develop a plan for the potential liquidation of Musicland.

36.    While formulating the liquidation alternative, Best Buy was approached by Sun about acquiring the company for a nominal price.

37.    However, Sun's offer would not result in any return on Best Buy's investment, so Best Buy devised a plan designed to give the appearance that its equity investments were loans, *i.e.*, debt, in the hope of salving some return on its huge investment in Musicland.

38.    On March 31, 2003, Best Buy, as lender, and TMG, as borrower, executed a Revolving Credit Loan Agreement (the "Loan Agreement"), ostensibly to create a lending arrangement between Best Buy and TMG and/or Musicland.

39.    According to the Loan Agreement, TMG was indebted to Best Buy "on account of term loans or inter-company advances made by [Best Buy] to finance [TMG's and/or Musicland's] working capital needs in the amount of $381,256,676."

40.    In reality the $381,256,676 constituted capital investment, not debt.

41.    The Loan Agreement also provides that "[Best Buy] may from time to time and in [Best Buy's] sole discretion make loans … to [TMG and/or Musicland] … so long as the aggregate amount of the Revolving Credit Facility outstanding at any one time does not exceed $400,000,000.00."

42.    In connection with the Loan Agreement and in a further effort to create the illusion of a lending relationship, on March 31, 2003, TMG executed a Revolving Note in the amount of $400 million (the "Note") for the benefit of Best Buy.

### D.    Musicland's Improper Transfers to Best Buy

43.    Upon information and belief, between March 31, 2003 and June 16, 2003, Musicland transferred approximately $110,385,892 in cash or other value property to Best Buy (the "First Transfer") purportedly to pay down amounts due under the Note, thereby reducing TMG's and/or Musicland's supposed indebtedness from $381,256,676 to $270,870,784.

44.    Upon information and belief, MSC purportedly assumed $35 million of the outstanding principal balance due under the Note, thereby reducing TMG's and/or Musicland's indebtedness from $270,870,784 to $235,870,784.

45.    On June 16, 2003, TMG executed an Amended and Restated Promissory Note in the amount of $235,870,784 (the "Amended and Restated Note"), for the benefit of Best Buy.

46.    On or about June 16, 2003, Best Buy purportedly agreed to reduce the outstanding principal balance due under the Amended and Restated Note from $235,870,784 to $30 million, in exchange for a $35 million cash payment by TMG and/or Musicland.

47.    On or about June 16, 2003, the $35 million cash payment was made to Best Buy (the "Second Transfer") purportedly to pay down the outstanding principal balance under the Amended and Restated Note to $30 million.

48.    On June 16, 2003, TMG executed a Second Amended and Restated Promissory Note in the amount of $30 million (the "Second Amended and Restated Note"), for the benefit of Best Buy.

E.     **Best Buy Sells Musicland**

49.     Upon information and belief, Sun formed Musicland Holding Corp. ("MHC") for the purpose of acquiring Musicland.

50.     Pursuant to a Stock Purchase Agreement, dated June 16, 2003, Best Buy caused MSC to sell its 100% stock ownership interest in TMG to MHC for $1.00.

51.     Pursuant to a Note Purchase Agreement, dated June 16, 2003, Best Buy purportedly sold the Second Amended and Restated Note to MHC for $1.00.

F.     **Musicland's Management, Compensation and Divided Loyalties**

52.     Upon information and belief, at times relevant to the claims asserted herein, Anderson, Jackson, Freeland and Lenzmeier were directors and/or officers of both Musicland and Best Buy.

53.     Upon information and belief, Anderson received more than $1.63 million in salary and compensation from Best Buy in 2003.

54.     Upon information and belief, Lenzemeier received more than $1.2 million in salary and compensation from Best Buy in 2003.

55.     Upon information and belief, as of March 1, 2003, Anderson owned or had a beneficial ownership in approximately 3.3 million shares of Best Buy.

56.     Upon information and belief, as of March 1, 2003, Lenzmeier owned or had a beneficial ownership in approximately 1.9 million shares of Best Buy.

57.     Upon information and belief, Anderson, Berg, Fuhrman, Freeland, Jackson, Lenzmeier and Muehlbauer (the "Pre-Sale Officers and Directors Defendants") were directors and/or officers of the Debtors prior to the sale of the Debtors (except Musicland Holding Corp.) to Musicland Holding Corp.

58.     Upon information and belief, at times relevant to the claims asserted herein, in addition to the foregoing, the Pre-Sale Officers and Directors Defendants received various other benefits, financial and otherwise, from Best Buy that were of substantial value.

59.     Upon information and belief, each of the Pre-Sale Officers and Directors Defendants had substantial personal interests in Best Buy.

60.     Upon information and belief, each of the Pre-Sale Officers and Directors Defendants were working for the best interests of themselves and Best Buy instead of Musicland.

61.     Upon information and belief, each of the Pre-Sale Officers and Directors Defendants were dependent upon Best Buy for continued employment and compensation and were therefore beholden to Best Buy to the detriment of Musicland.

62.     Upon information and belief, each of the Pre-Sale Officers and Directors Defendants lacked independence and was committed to benefiting Best Buy as well as his/her own personal interests instead of the interests of Musicland.

63.     Upon information and belief, because each of the Pre-Sale Officers and Directors Defendants relied on Best Buy for compensation and/or other benefits and maintained substantial personal interests in Best Buy, each of the Pre-Sale Officers and Directors Defendants lacked independence.

64.     Upon information and belief, because of the foregoing relationships with Best Buy, each of the Pre-Sale Officers and Directors Defendants had material adverse personal interests at the time decisions were made for Musicland, and, therefore, was not working for the benefit of Musicland.

65.     Upon information and belief, as a result of the foregoing, the Pre-Sale Officers and Directors Defendants disregarded and failed appropriately to fulfill their responsibilities to Musicland.

66.     Upon information and belief, Krouse and Leder (the "Post-Sale Officers and Directors Defendants") were directors and officers of the Debtors after the sale of the Debtors (except for Musicland Holding Corp.) to Musicland Holding Corp. and were Co-Chief Executive Officers of Sun.

67.     Upon information and belief, at times relevant to the claims asserted herein times, in addition to the foregoing, the Post-Sale Officers and Directors Defendants received various benefits, financial and otherwise, from Sun that were of substantial value.

68.     Upon information and belief, each of the Post-Sale Officers and Directors Defendants had substantial personal interests in Sun.

69.     Upon information and belief, each of the Post-Sale Officers and Directors Defendants were working for the best interests of themselves and Sun instead of Musicland.

70.     Upon information and belief, each of the Post-Sale Officers and Directors Defendants were dependent upon Sun for continued employment and compensation and were therefore beholden to Sun to the detriment of Musicland.

71.     Upon information and belief, each of the Post-Sale Officers and Directors Defendants lacked independence and was committed to benefiting Sun as well as his own personal interests instead of the interests of Musicland.

72.     Upon information and belief, because each of the Post-Sale Officers and Directors Defendants relied on Sun for compensation and/or other benefits and maintained substantial

personal interests in Sun, each of the Post-Sale Officers and Directors Defendants lacked independence.

73.    Upon information and belief, because of the foregoing relationships with Sun, each of the Post-Sale Officers and Directors Defendants had material adverse personal interests at the time decisions were made for Musicland, and, therefore, was not working for the benefit of Musicland.

74.    Upon information and belief, as a result of the foregoing, the Post-Sale Officers and Directors Defendants disregarded and failed appropriately to fulfill their responsibilities to Musicland.

75.    Upon information and belief, as a result of, and in addition to, the foregoing, the Pre-Sale Officers and Directors Defendants and the Post-Sale Officers and Directors Defendants (collectively, the "Officers and Directors Defendants") either (a) failed to take any steps whatsoever to evaluate or consider the propriety of the Loan Agreement, the Note, the Amended and Restated Note and the Second Amended and Restated Note (together, the "Debt Instruments") or the First Transfer and the Second Transfer (together, the "Transfers"); or (b) knew that the Debt Instruments and the Transfers were improper, but nevertheless permitted Musicland to enter into the Debt Instruments and make the Transfers to Musicland's detriment and Best Buy's and Sun's benefit.

### FIRST CLAIM FOR RELIEF
### (Recharacterization)

76.    Plaintiff restates and realleges the allegations of paragraphs "1" through "75" above, as if fully set forth herein.

77.    The funds or other consideration Best Buy advanced to or on behalf of TMG and/or Musicland, including without limitation, Best Buy's assumption of the Third Party Debt

and the funds reflected by the Debt Instruments, were, in fact, capital contributions by Best Buy

to TMG and/or Musicland, not debt.

78.     The parties did not intend to create an unconditional obligation for TMG and/or

Musicland to repay such funds.

79.     Among the *indicia* evidencing the fact that such funds were in fact capital/equity

investments, not debt, are, without limitation, the following: (a) the Debt Instruments were

"created" almost 2 ½ years after Best Buy's initial capital contribution in an attempt to create the

illusion that funds advanced by Best Buy to the Debtors were debt, not equity; (b) there was no

viable source of repayment for the advanced funds; (c) the Debtors were severely

undercapitalized at all times; (d) Best Buy was an insider and in control of the Debtors when

such funds were advanced; (e) there was no sinking fund established when such funds were

advanced; (f) no non-insider third party would have advanced such funds to the Debtors at the

time the funds were advanced because of the Debtors' inability to repay such obligations; and (g)

the Debtors gave Best Buy no security for such advances.

80.     The funds outstanding and repaid in connection with the Debt Instruments should

be recharacterized from debt to equity or capital contributions.

## SECOND CLAIM FOR RELIEF
### (State Law Fraudulent Transfer)[4]

81.     Plaintiff restates and realleges the allegations of paragraphs "1" through "80"

above, as if fully set forth herein.

82.     Pursuant to Bankruptcy Code § 544(b), Plaintiff may avoid any transfer of an

interest of the Debtors in property that is voidable under applicable state law.

---

[4]    The Transfers are avoidable pursuant to the state laws of either Delaware, Minnesota or New York.  As the
relevant laws in all three states are nearly identical (*compare* 6 Del. § 1301 *et seq.*, *with* Minn. Stat. § 513.41 *et
seq.*, *with* NY DCL § 270 *et seq.*), the Committee does not (and need not) separately plead each state law claim.

83.     The Transfers constitute transfers of the Debtors' assets or an interest of the

Debtors in property.

84.     Best Buy was an insider of the Debtors at the time of the Transfers.

85.     The Debtors were insolvent at the time of the Transfers.

86.     The Transfers were made with the actual intent to hinder, delay or defraud

creditors of the Debtors.

87.     The Transfers constitute fraudulent transfers which should be avoided pursuant to

Bankruptcy Code § 544 and applicable state law,[5] and are recoverable from Best Buy pursuant to

Bankruptcy Code § 550.

### THIRD CLAIM FOR RELIEF
### (State Law Fraudulent Transfer)

88.     Plaintiff restates and realleges the allegations of paragraphs "1" through "80"

above, as if fully set forth herein.

89.     The Transfers constitute transfers of the Debtors' assets or an interest of the

Debtors in property.

90.     The Debtors received less than a reasonably equivalent value in exchange for the

Transfers because the Transfers were purportedly made to satisfy the Debtors' debt obligations

to Best Buy, when, in fact, no such obligations existed.

91.     The Transfers were made without fair consideration because the Transfers were

purportedly made to satisfy the Debtors' debt obligations to Best Buy, when, in fact, no such

obligations existed.

92.     At the time the Transfers were made, the Debtors were engaged in a business or a

transaction, or were about to engage in a business or a transaction, for which any assets or

---

[5]     *See* 6 Del. § 1304(a)(1); Minn. Stat. § 513.44(a)(1); and NY DCL § 276.

property remaining with the Debtors after the Transfers were made was unreasonably small, or constituted an unreasonably small capital in relation to the Transfers.

93.     The Transfers constitute fraudulent transfers which should be avoided pursuant to Bankruptcy Code § 544 and applicable state law,[6] and are recoverable from Best Buy pursuant to Bankruptcy Code § 550.

## FOURTH CLAIM FOR RELIEF
### (State Law Fraudulent Transfer)

94.     Plaintiff restates and realleges the allegations of paragraphs "1" through "80" above, as if fully set forth herein.

95.     The Transfers constitute transfers of the Debtors' assets or an interest of the Debtors in property.

96.     The Debtors received less than a reasonably equivalent value in exchange for the Transfers because the Transfers were purportedly made to satisfy the Debtors' debt obligations to Best Buy, when, in fact, no such obligations existed.

97.     The Transfers were made without fair consideration because the Transfers were purportedly made to satisfy the Debtors' debt obligations to Best Buy, when, in fact, no such obligations existed.

98.     At the time the Transfers were made, the Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond the Debtors' ability to pay as such debts matured or became due.

99.     The Transfers constitute fraudulent transfers which should be avoided pursuant to Bankruptcy Code § 544 and applicable state law,[7] and are recoverable from Best Buy pursuant to Bankruptcy Code § 550.

---

[6]     *See* 6 Del. § 1304(a)(2)(a); Minn. Stat. § 513.44(a)(2)(i); and NY DCL § 274.

## FIFTH CLAIM FOR RELIEF
### (State Law Fraudulent Transfer)

100.   Plaintiff restates and realleges the allegations of paragraphs "1" through "80" above, as if fully set forth herein.

101.   There exists one or more creditors of the Debtors whose claim(s) arose prior to the Transfers.

102.   The Transfers constitute transfers of the Debtors' assets or an interest of the Debtors in property.

103.   The Debtors received less than a reasonably equivalent value in exchange for the Transfers because the Transfers were purportedly made to satisfy the Debtors' debt obligations to Best Buy, when, in fact, no such obligations existed.

104.   The Transfers were made without fair consideration because the Transfers were purportedly made to satisfy the Debtors' debt obligations to Best Buy, when, in fact, no such obligations existed.

105.   The Debtors were insolvent on the date that the Transfers were made or became insolvent as a result of the Transfers.

106.   The Transfers constitute fraudulent transfers which should be avoided pursuant to Bankruptcy Code § 544 and applicable state law,[8] and are recoverable from Best Buy pursuant to Bankruptcy Code § 550.

## SIXTH CLAIM FOR RELIEF
### (State Law Fraudulent Transfer)

107.   Plaintiff pleads this Sixth Claim for Relief in the alternative and restates and realleges the allegations of paragraphs "1" through "75" above, as if fully set forth herein.

---

[7]   *See* 6 Del. § 1304(a)(2)(b); Minn. Stat. § 513.44(a)(2)(ii); and NY DCL § 275.

[8]   *See* 6 Del. § 1305(a); Minn. Stat. § 513.45(a); and NY DCL § 273.

108.   There exists one or more creditors of the Debtors whose claim(s) arose prior to the Transfers.

109.   The Transfers constitute transfers of an interest of the Debtors in property.

110.   Best Buy was an insider of the Debtors at the time of the Transfers.

111.   The Transfers were made on account of an antecedent debt as reflected by the Debt Instruments.

112.   The Debtors were insolvent on the date that the Transfers were made.

113.   Best Buy had reasonable cause to believe that the Debtors were insolvent on the date that the Transfers were made.

114.   The Transfers constitute fraudulent transfers which should be avoided pursuant to Bankruptcy Code § 544 and applicable state law,[9] and are recoverable from Best Buy pursuant to Bankruptcy Code § 550.

## SEVENTH CLAIM FOR RELIEF
### (Illegal Dividends)

115.   Plaintiff restates and realleges the allegations of paragraphs "1" through "80" above, as if fully set forth herein.

116.   The Debtors provided cash and/or property to their shareholder Best Buy as a result of the Transfers set forth above.  To the extent such cash or property is deemed to be *de facto* dividends on account of Best Buy's equity interest in Musicland, Anderson, Furhman, Jackson, Krouse, Leder and Lenzmeier are personally liable for the amount of such dividends due to their willful, negligent or express or tacit approval of the transfer of such dividends, while the Debtors lacked a sufficient surplus or net profits, in violation of Delaware's General Corporation Law, including, without limitation, to §§ 170, 172, 173 and 174.

---

[9]   *See* 6 Del. § 1305(b); and Minn. Stat. § 513.45(b).

117.   Best Buy is obligated to disgorge such illegal dividends.

## EIGHTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

118.   Plaintiff restates and realleges the allegations of paragraphs "1" through "80" above, as if fully set forth herein.

119.   At all relevant times during 2003, the Debtors were insolvent and/or in the vicinity or zone of insolvency.

120.   The Officers and Directors Defendants owed fiduciary duties to the Debtors.

121.   The Officers and Directors Defendants breached their fiduciary duties (including, without limitation, their duty of loyalty) to the Debtors by, among other things:

   a.   failing to act in good faith or acting intentionally or knowingly by permitting the Debtors to enter into or make the Debt Instruments and/or make the Transfers, which Transfers constituted unlawful fraudulent transfers, improper transfers and/or illegal dividends.

   b.   continuing to receive compensation and/or other benefits from the Debtors and Best Buy and/or Sun;

   c.   continuing the Debtors' business operations for the purpose of providing substantial benefit to Best Buy in the form of the Transfers;

   d.   consciously and intentionally abdicating their duties to the Debtors; and

   e.   acting only in the interest of Best Buy and/or Sun at a time when the Debtors were insolvent and/or in the vicinity of or zone or insolvency.

122.   The Debtors were harmed by the Officers and Directors Defendants' breaches of fiduciary duties.

## NINTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty)

123.     Plaintiff restates and realleges the allegations of paragraphs "1" through "80" and paragraphs "118" through "122" above, as if fully set forth herein.

124.     Best Buy knew that the Officers and Directors Defendants' conduct constituted a breach of their fiduciary duty.

125.     Best Buy substantially assisted or encouraged the Officers and Directors Defendants in breaching their fiduciary duty.

126.     The Debtors were harmed by Best Buy's conduct.

## TENTH CLAIM FOR RELIEF
### (Rescission of the Debt Instruments Based Upon Unilateral Mistake)

127.     Plaintiff pleads this Tenth Claim for Relief in the alternative and restates and realleges the allegations of paragraphs "1" through "80" above, as if fully set forth herein.

128.     TMG entered into and/or made the Debt Instruments based on its mistaken belief of a material and fundamental fact that the monetary contributions Best Buy made to, or on behalf of, Musicland constituted loans (*i.e.*, debt), not equity, and therefore, the minds of the parties never met.

129.     TMG's mistaken belief relates to the consideration exchanged.

130.     TMG would not have executed the Debt Instruments and would not have made the Transfers had it known that Best Buy's contributions to, or on behalf of, Musicland constituted equity, not loans (*i.e.*, debt).

131.     TMG's belief as to the true nature of Best Buy's contributions was honestly mistaken despite TMG's exercise of ordinary care.

132.     Best Buy was aware of TMG's mistaken belief and sought to take advantage of it.

133.    The enforcement of the Debt Instruments would be unconscionable and would unjustly enrich Best Buy to the Debtors' detriment.

134.    No intervening rights of any third-parties have accrued.

135.    As a result of TMG's unilateral mistake, the Debt Instruments should be rescinded *ab initio*, the parties may and should be placed in the same positions they occupied prior to the execution of the documents and Best Buy should be required to disgorge the amount of the Transfers.

136.    Plaintiff has no adequate remedy at law.

## ELEVENTH CLAIM FOR RELIEF
### (Rescission of the Debt Instruments Based Upon Mutual Mistake)

137.    Plaintiff pleads this Eleventh Claim for Relief in the alternative and restates and realleges the allegations of paragraphs "1" through "80" above, as if fully set forth herein.

138.    TMG and Best Buy entered into and/or respectively made and received the Debt Instruments on the mutual mistaken belief that the monetary contributions Best Buy made to, or on behalf of, Musicland constituted loans (*i.e.*, debt), not equity.

139.    TMG and Best Buy's mutual mistaken belief that the monetary contributions Best Buy made to, or on behalf of, Musicland constituted loans (*i.e.*, debt), not equity, was a basic assumption on which the Debt Instruments were made and has a material effect on the agreed exchange of performances.

140.    TMG did not assume the risk of the mutual mistaken belief.

141.    As a result of the parties' mutual mistake, the Debt Instruments should be rescinded *ab initio*, the parties may and should be placed in the same positions they occupied prior to the execution of the documents and Best Buy should be required disgorge the amount of the Transfers.

142.    Plaintiff has no adequate remedy at law.

## TWELFTH CLAIM FOR RELIEF
### (Rescission of the Debt Instruments Based Upon Fraud)

143.    Plaintiff pleads this Twelfth Claim for Relief in the alternative and restates and realleges the allegations of paragraphs "1" through "80" above, as if fully set forth herein.

144.    To induce TMG to enter into and/or make the Debt Instruments, Best Buy represented to TMG that the monetary contributions it made to, or on behalf of, Musicland constituted loans (*i.e.*, debt), not equity.

145.    Best Buy's representations were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material terms regarding the Debt Instruments.

146.    Best Buy omitted material facts in such representations, which were required to be stated therein or necessary to make such representations not misleading.

147.    Best Buy made the representations intentionally and knowingly and with the intent that TMG rely upon them.

148.    TMG justifiably relied on Best Buy's representations, believed them to be true, and was thereby induced to execute the Debt Instruments and make the Transfers.

149.    TMG would not have executed the Debt Instruments and would not have made the Transfers had it known that Best Buy's contributions to, or on behalf of, Musicland constituted equity, not loans (*i.e.*, debt).

150.    Best Buy made the representations and concealed the foregoing facts with intent to deceive and defraud the Debtors and to induce TMG to execute the Debt Instruments and make the Transfers.

151.   As a result of Best Buy's fraudulent inducement, the Debt Instruments should be rescinded *ab initio*, the parties should be placed in the same positions they occupied prior to the execution of the documents and Best Buy should be required to disgorge the amount of the Transfers.

152.   Plaintiff has no adequate remedy at law.

**WHEREFORE,** Plaintiff, on behalf of the Debtors' estate, demands judgment against defendants as follows:

a.   on its First Claim for Relief, recharacterizing from debt to equity the funds Best Buy advanced to or on behalf of TMG and/or Musicland, including without limitation, Best Buy's assumption of the Third Party Debt and the funds reflected by the Debt Instruments;

b.   on its Second Claim for Relief, avoiding the Transfers and awarding Plaintiff the sum of $145,385,892, plus interest thereon;

c.   on its Third Claim for Relief, avoiding the Transfers and awarding Plaintiff the sum of $145,385,892, plus interest thereon;

d.   on its Fourth Claim for Relief, avoiding the Transfers and awarding Plaintiff the sum of $145,385,892, plus interest thereon;

e.   on its Fifth Claim for Relief, avoiding the Transfers and awarding Plaintiff the sum of $145,385,892, plus interest thereon;

f.   on its Sixth Claim for Relief, avoiding the Transfers and awarding Plaintiff the sum of $145,385,892, plus interest thereon;

g.   on its Seventh Claim for Relief, (1) a judgment against (i) Anderson, Furhman, Jackson and Lenzmeier for the First Transfer and the Second

Transfer; and (ii) a judgment against Krouse and Leder for the Second

Transfer; and (2) awarding Plaintiff the sum of $145,385,892, plus interest

thereon;

h.      on its Eighth Claim for Relief, (1) a judgment against (i) the Pre-Sale

Officers and Directors Defendants for the First Transfer and the Second

Transfer; and (ii) a judgment against the Post-Sale Officers and Directors

Defendants for the Second Transfer; and (2) awarding Plaintiff the sum of

$145,385,892, plus interest thereon;

i.      on its Ninth Claim for Relief, awarding Plaintiff the sum of $145,385,892,

plus interest thereon;

j.      on its Tenth Claim for Relief, (1) rescinding the Debt Instruments; (2)

ordering Best Buy to disgorge $145,385,892; and (3) awarding Plaintiff

the sum of $145,385,892, plus interest thereon;

k.      on its Eleventh Claim for Relief, (1) rescinding the Debt Instruments; (2)

ordering Best Buy to disgorge $145,385,892; and (3) awarding Plaintiff

the sum of $145,385,892, plus interest thereon;

l.      on its Twelfth Claim for Relief, (1) rescinding the Debt Instruments; (2)

ordering Best Buy to disgorge $145,385,892; and (3) awarding Plaintiff

the sum of $145,385,892, plus interest thereon;

m.      reimbursement of the costs and expenses of this adversary proceeding

including reasonable attorneys' fees; and

n.      for such other and further relief as the Court deems just and proper.

Dated:  January 11, 2008
        New York, New York

**HAHN & HESSEN LLP**

_____*/s/* Mark T. Power_____

Mark T. Power (MP-1607)
John P. Amato (JA-4997)
Robert J. Malatak (RM-6292)
Edward L. Schnitzer (ES-6299)
488 Madison Avenue
New York, New York 10022
(212) 478-7200

*Counsel to The Official Committee of Unsecured*
*Creditors of Musicland Holding Corp., et al.*